IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:14-CV-99-D

| | | |
|---|---|---|
| PCS PHOSPHATE COMPANY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| AMERICAN HOME ASSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

On February 20, 2014, PCS Phosphate Company, Inc. ("PCS"), filed a complaint against American Home Assurance Company ("American Home") [D.E. 1]. PCS seeks a declaratory judgment that American Home owes PCS a duty to defend and a duty to indemnify in two underlying actions concerning alleged environmental contamination. See PCS Compl. [D.E. 1] ¶¶ 26–32.

On November 14, 2014, American Home filed a third-party complaint against Zurich American Insurance Company ("Zurich American") and Federal Insurance Company ("Federal") [D.E. 31]. American Home seeks a declaratory judgment that Zurich American and Federal owe duties to defend and indemnify PCS in the underlying environmental contamination actions and therefore must either indemnify American Home for its costs in defending PCS or, alternatively, contribute costs of defending and indemnifying PCS. See AHAC Compl. [D.E. 31]. Zurich American answered the complaint, and Federal moved to dismiss it. See [D.E. 56, 46]. On June 15, 2015, this court granted in part and denied in part, without prejudice, Federal's motion to dismiss. [D.E. 61]. On July 20, 2015, American Home filed an amended third-party complaint against both Federal and Zurich American [D.E. 66], and, on August 21, 2015, Zurich American answered [D.E. 70].

On August 26, 2015, Zurich American moved for partial judgment on the pleadings and filed a supporting memorandum. [D.E. 72, 73]. On September 21, 2015, American Home responded in opposition [D.E. 75], and, on October 7, 2015, Zurich American replied [D.E. 76]. As explained below, the court grants Zurich American's motion for partial judgment on the pleadings.

I.

From 1965 to 2006, Ward Transformer Company, Inc., and Ward Transformer Sales and Service, Inc., (collectively "Ward") built, repaired, reconditioned, and sold transformers in Raleigh, North Carolina. PCS Compl. ¶ 1. Between 1978 and 2002, PCS and its local predecessor, Texasgulf, Inc. ("Texasgulf"), sent transformers to Ward for repair and refurbishment. Id. ¶ 3. During the transformer repairs, polychlorinated biphenyls ("PCBs") were released, causing environmental contamination at the Ward facility ("Ward Site"). Id. ¶ 4.

The Environmental Protection Agency ("EPA") conducted a remedial investigation of the Ward Site and, in September 2005, entered into a settlement agreement with Consolidation Coal Company ("Consol") and Carolina Power & Light Company ("CP&L") to remove contamination at the Ward Site and to reimburse the EPA for its costs. Id. ¶¶ 5–6. On April 18, 2008, PCS notified American Home that PCS had been identified as a potentially responsible party for the Ward Site contamination and demanded that American Home defend and indemnify PCS in any resulting lawsuits. See id. ¶ 7. On April 30, 2009, Consol and CP&L each filed an action against PCS seeking contribution for past and future costs associated with the settlement agreement. Id. ¶¶ 8, 10. On July 15, 2009, PCS notified American Home of the two lawsuits and again stated its demand for defense and indemnification. Id. ¶ 13. Subject to a reservation of rights, American Home agreed to defend PCS in the Consol and CP&L actions. See AHAC Am. Compl. [D.E. 66] ¶ 13.

Zurich American issued a series of Commercial General Liability policies ("the Zurich Policies") to Texas Gulf, Inc., Texas Gulf Western, Inc., Societe National, Elf Aquitane, Inc., Potash Corporation of Saskatchewan Inc., M&T Chemicals, Inc., and their subsidiaries. Id. ¶ 15; see Zurich

2

American's Mem. Supp. Exs. A–F [D.E. 73-2–73-7]. The policies cumulatively provide insurance coverage from January 1, 1981, to January 1, 1986, and from June 30, 2005, to June 30, 2008. AHAC Am. Compl. ¶ 15. PCS is an insured under the policies. Id. ¶ 19. In each policy, Zurich American agrees to pay "all sums which the Insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies caused by an occurrence" and to "defend any suit against the insured seeking damages on account of such . . . property damage, even if any of the allegations of the suit are groundless, false or fraudulent." [D.E. 73-2] 7; [D.E. 73-3] 6; [D.E. 73-4] 10; [D.E. 73-5] 35; [D.E. 73-6] 5; see [D.E. 73-7] 4–5 (limiting the duty to defend to "civil action[s]"). In its amended third-party complaint, American Home seeks a declaratory judgment that these policies oblige Zurich American to defend and to indemnify PCS in the Consol and CP&L actions and for "liability for cleanup associated with the Ward Site" (collectively, the "underlying actions"). AHAC Am. Compl. 9, ¶ 9. American Home also seeks a declaratory judgment that Zurich American must indemnify American Home for its costs or, alternatively, contribute defense and indemnification costs. Id. 9.

On August 26, 2015, Zurich American moved for partial judgment on the pleadings pursuant to Rule 12(c). [D.E. 72, 73]; see Fed. R. Civ. P. 12(c). Zurich American argues that pollution exclusion clauses in each of the Zurich policies preclude any duty to defend or indemnify PCS in the underlying actions and, consequently, preclude any duties to indemnify American Home or to contribute to PCS's defense. [D.E. 72] 2.

II.

Federal Rule of Civil Procedure 12(c) permits a party to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings should be granted if "the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." Park Univ. Enters. v. Am. Cas. Co. of Reading, 442 F.3d 1239, 1244 (10th Cir. 2006)

3

(quotation omitted), abrogation on other grounds recognized by Magnus, Inc. v. Diamond State Ins. Co., 545 F. App'x 750 (10th Cir. 2013) (unpublished); see Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 674 F.3d 369, 375 (4th Cir. 2012); Burbach Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 405–06 (4th Cir. 2002).

A court ruling on a Rule 12(c) motion for judgment on the pleadings applies the same standard as in a Rule 12(b)(6) motion to dismiss. See, e.g., Mayfield, 674 F.3d at 375; Burbach Broad. Co. of Del., 278 F.3d at 405–06. A motion under either rule tests the legal and factual sufficiency of the claim. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80, 684 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(c) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to the [nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 347, 352–53 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013); Burbach Broad. Co. of Del., 278 F.3d at 406. A court need not accept a pleading's legal conclusions. Iqbal, 556 U.S. at 678–79; Giarratano, 521 F.3d at 302. Nor must it "accept as true unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted). Rather, plaintiffs' allegations must "nudge[] their claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausib[ility]." Iqbal, 556 U.S. at 678–79.

When evaluating a Rule 12 motion, a court considers the pleadings and any materials "attached or incorporated into the complaint." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011); see Fed. R. Civ. P. 10(c); Thompson v. Greene, 427 F.3d 263, 268 (4th Cir. 2005); Fayetteville Inv'rs v. Commercial Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991). A court also may take judicial notice of public records such as court documents. See, e.g.,

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Here, American Home's amended complaint expressly incorporates PCS's complaint [D.E. 1], the complaints of Consol and CP&L in the underlying actions [D.E. 66-1–66-2], and the Zurich policies [D.E. 73-2–73-7]. The court also considers the Texasgulf business records that American Home attached to the amended complaint as Exhibit 3 [D.E. 66-3]. The parties have attached copies of each of these documents to their submissions, and there is no dispute as to their authenticity. See AHAC Am. Compl. [D.E. 66] ¶¶ 8–12, 15, 21.[1] Thus, the court may consider them in ruling on Zurich American's motion for judgment on the pleadings.

A federal court sitting in diversity applies the choice-of-law rules of the forum state. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); DiFederico v. Marriott Int'l, Inc., 714 F.3d 796, 807 (4th Cir. 2013); Fed. Ins. Co. v. S. Lithoplate, Inc., 7 F. Supp. 3d 579, 583 (E.D.N.C. 2014). Here, American Home seeks declaratory judgment as to Zurich American's obligations under a series of insurance contracts. See AHAC Am. Compl. ¶¶ 15–21, 29–35, 41–44, 46. Under North Carolina law, the "substantive law of the state where the last act to make a binding contract occurred, usually delivery of the policy, controls the interpretation of the contract." Fortune Ins. Co. v. Owens, 351 N.C. 424, 428, 526 S.E.2d 463, 466 (2000).

The six insurance policies at issue in this litigation were delivered in two jurisdictions. Policies GA8955272, GA8070205, CGL 3278693-01, CGL 3251966-01, CGL3251966-00 (the "1981–1986 policies") were delivered in Stamford, Connecticut. [D.E. 73] 5–6, 15 n.9; see [D.E. 73-2–73-6]; see also [D.E. 75] 7 n.9. Thus, Connecticut law controls the interpretation of the

---

[1] American Home argues that Zurich American "has expressly denied" the accuracy of the copies of several policies that Zurich American attached to its own motion. [D.E. 75] 6 n.7. Zurich American's statement that it "could not attest to the accuracy" of these policies does not constitute a challenge to their authenticity. Compare [D.E. 73] 5 and [D.E. 70] ¶ 15 with, e.g., McDowell v. Norfolk S. Corp., No. 2:06-CV-00038D, 2007 WL 2815743, at *3 (E.D.N.C. Jan. 24, 2007) (unpublished), aff'd, 228 F. App'x 369 (4th Cir. 2007) (per curiam) (unpublished).

1981–1986 policies. Policy 8831112 (the "2005–2008 policy") was delivered in Saskatoon, Saskatchewan. [D.E. 73] 6, 18–19; [D.E. 73-7]; see [D.E. 75] 10 n.11. The Supreme Court of Canada provides the most authoritative construction of insurance contracts executed in any Canadian province. See, e.g., Progressive Homes Ltd. v. Lombard Gen. Ins. Co. of Can., 2010 SCC 33, paras. 21–25 (Can.); Non-Marine Underwriters, Lloyd's of London v. Scalera, 2000 SCC 24, paras. 49–52 (Can.); Consol.-Bathurst Exp. Ltd. v. Mut. Boiler & Mach. Ins. Co., [1980] 1 S.C.R. 888, 899–904 (Can. 1979). Thus, Canadian law controls the interpretation of the 2005–2008 policy.

A.

The court first analyzes whether Zurich American has a contractual duty to defend PCS under the 1981–1986 policies. Each policy obliges Zurich American to "defend any suit against the insured seeking damages on account of . . . property damage [caused by an occurrence]." [D.E. 73-2] 7; [D.E. 73-3] 6; [D.E. 73-4] 10; [D.E. 73-5] 35; [D.E. 73-6] 5. Under Connecticut law, "the duty to defend is broader than the duty to indemnify." Travelers Cas. & Sur. Co. of Am. v. Neth. Ins. Co., 95 A.3d 1031, 1049 (Conn. 2014) (quotation omitted). The complainant must show (1) the existence of an underlying "suit" that triggers the contractual duty to defend, see R.T. Vanderbilt Co. v. Cont'l Cas. Co., 870 A.2d 1048, 1059–60 (Conn. 2005), and (2) that "at least one allegation of the complaint falls even possibly within the coverage." Neth. Ins. Co., 95 A.3d at 1049 (quotation omitted); see Hartford Cas. Ins. Co. v. Litchfield Mut. Fire Ins. Co., 876 A.2d 1139, 1144 (Conn. 2005) ("If an allegation of the complaint falls even possibly within the coverage, then the insurance company must defend the insured." (emphasis in original) (quotation omitted)). The duty to defend arises "even though facts outside the four corners of [the] pleadings indicate that the claim may be meritless or not covered." Neth. Ins. Co., 95 A.3d at 1049 (quotation omitted); cf. [D.E. 73-2] 7 (Zurich American agreed to defend PCS "even if any of the allegations of the [underlying] suit are groundless, false or fraudulent"); [D.E. 73-3] 6 (same); [D.E. 73-4] 10 (same); [D.E. 73-5] 35 (same); [D.E. 73-6] 5 (same). The underlying complaint need not "specify the connection between

the stated cause of action and the policy coverage." Misiti, LLC v. Travelers Prop. Cas. Co. of Am., 61 A.3d 485, 491 (Conn. 2013) (quotation omitted).

"Despite the breadth of this approach," Connecticut law "recognize[s] the necessary limits of this rule" and "will not predicate the duty to defend on a reading of the complaint that is conceivable but tortured and unreasonable." Id. (quotation and alteration omitted). Rather, the duty to defend arises "only if the underlying complaint reasonably alleges an injury that is covered by the policy." Id. (emphasis in original). The requirement that the reading of the underlying complaint be reasonable comports with pleading requirements in federal court. The duty to defend does not obviate the Rule 12 requirement that a plaintiff's factual allegations "plausibly"—not just "possibly"—support a claim to relief. See Twombly, 550 U.S. at 557, 570; Iqbal, 556 U.S. at 679.

To determine whether the underlying allegations fall within the insurance coverage, a court must interpret the insurance contract itself. The court construes the contract "to effectuate the intent of the parties as expressed by their words and purposes. . . . [U]nambiguous terms are to be given their plain and ordinary meaning." Neth. Ins. Co., 95 A.3d at 1049–50 (quotation omitted) (alterations in original); see Heyman Assocs. No. 1. v. Ins. Co. of Pa., 653 A.2d 122, 130 (Conn. 1995).

Zurich American argues that it cannot be held liable for PCB contamination at the Ward Site under the 1981–1986 policies because the policies exclude coverage for pollution. The 1981–1986 policies each contain an identical pollution exclusion:

> This insurance does not apply . . . to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental . . . .

[D.E. 73-2] 7; [D.E. 73-3] 7; [D.E. 73-4] 10; [D.E. 73-5] 35; [D.E. 73-6] 6. The exclusion duplicates in substantial part the pollution exclusion in the Federal insurance policy that the court analyzed in its June 15, 2015 order. See [D.E. 46-1] 7. Zurich American contends that the Consol and CP&L

7

actions against PCS fall into this exclusion and it therefore has no duty to defend or indemnify PCS under the 1981–1986 policies. See [D.E. 73] 11–17.

The pollution exclusion states that the insurance policy will not provide for indemnity or create a duty to defend in the case of a release of pollutants. But the pollution exclusion itself contains an exception: "[T]his exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental." [D.E. 73-2] 7; [D.E. 73-3] 7; [D.E. 73-4] 10; [D.E. 73-5] 35; [D.E. 73-6] 6. In other words, if an underlying complaint alleges a sudden and accidental release of pollutants, the pollution exclusion does not apply and Zurich American has a duty to defend and (potentially) a duty to indemnify PCS. A "sudden" release must "occur in a rapid or otherwise abrupt manner. The release of pollutants over an extended period of time cannot qualify as 'sudden' for purposes of the exception to the pollution exclusion." Buell Indus., Inc. v. Greater N.Y. Mut. Ins. Co., 791 A.2d 489, 503 (Conn. 2002). Thus, damage due to slow leakage of pollutants from a container would be excluded from insurance coverage, but the same pollution damage would be covered if the container suddenly, accidentally exploded.

When an insurer contends that a loss is excluded under a pollution exclusion, the insurer initially must establish "that the underlying complaint alleges damages attributable to the discharge or release of a pollutant into the environment." Id. at 505 (quotation omitted). If the insurer meets that burden, the burden shifts to the insured to "demonstrate a reasonable interpretation of the underlying complaint potentially bringing the claims within the sudden and accidental discharge exception to exclusion of pollution coverage." Id. (quotation omitted); see Vt. Mut. Ins. Co. v. Ciccone, 900 F. Supp. 2d 249, 259 (D. Conn. 2012) (Connecticut law imposes a duty to defend if "the allegations contained within an underlying complaint fall . . . possibly outside of the relevant insurance policy exclusions." (quotation omitted)); Neth. Ins. Co., 95 A.3d at 1049; Capstone Bldg. Corp. v. Am. Motorists Ins. Co., 67 A.3d 961, 992 (Conn. 2013); Moore v. Cont'l Cas. Co., 746 A.2d 1252, 1254 (Conn. 2000). If the insured fails to meet that burden, the court may dismiss the

8

claim as a matter of law. See, e.g., Stamford Wallpaper Co. v. TIG Ins., 138 F.3d 75, 79–81 (2d Cir. 1998).

The original complaint contained only two underlying actions: the CP&L action and the Consol action. AHAC Compl. ¶ 8. In its amended complaint, American Home adds "liability for cleanup associated with the Ward Site" to its list of "underlying actions," see AHAC Am. Compl. ¶ 9, but it does not specify a particular "suit against the insured" that Zurich American might be obliged to defend under the general liability policies. See [D.E. 73-2] 7; [D.E. 73-3] 6; [D.E. 73-4] 10; [D.E. 73-5] 35; [D.E. 73-6] 5. American Home later clarified that the added reference in the Amended Complaint is to a September 30, 2008, "PRP letter" from the United States Environmental Protection Agency ("EPA"). See [D.E. 75] 2. A PRP letter from the EPA can constitute a "suit" for the purposes of triggering the duty to defend under Connecticut law. See R.T. Vanderbilt Co., 870 A.2d at 1060. Even if the court construes "liability for cleanup" within the amended complaint to include the September 30, 2008 EPA PRP letter, American Home has made no attempt to show that the allegations in that PRP letter might be reasonably interpreted to support a covered claim.[2] Thus, the court considers only the CP&L and Consol actions as underlying actions.

Zurich American has established that the underlying actions allege damage due to the release of contaminants into the environment. See, e.g., CP&L Compl. [D.E. 55-1] ¶¶ 10–13, 24–25, 59(106); Consol Compl. [D.E. 55-2] ¶¶ 9, 169–71, 179–80.[3] Specifically, each of the underlying

---

[2] Zurich American submitted a copy of the PRP letter to the court as an attachment to its reply memorandum in support of its motion. See [D.E. 76-4]. If American Home had specified in the complaint that it considered the PRP letter to be an underlying action, the court would consider the PRP letter as part of the complaint. See Fed. R. Civ. P. 10(c); E.I. du Pont de Nemours & Co., 637 F.3d at 448; Thompson, 427 F.3d at 268; Fayetteville Inv'rs, 936 F.2d at 1465. American Home, however, did not specifically refer to the PRP letter in its amended complaint or attach the letter to its pleadings. Accordingly, the court does not consider it under Rule 12(c). See, e.g., Wilson-Cook Med., Inc. v. Wilson, 942 F.2d 247, 252 (4th Cir. 1991).

[3] Alternatively, if the court did consider "liability for cleanup" under the PRP letter to be a valid underlying action, Zurich American has met its burden with respect to this action as well. See AHAC Am. Compl. ¶ 10 ("The operative complaints in the Underlying Actions seek unspecified

9

Case 5:14-cv-00099-D  Document 92  Filed 03/29/16  Page 9 of 19

actions alleges damage due to release of PCBs at the Ward Site. Consol Compl. ¶ 1; CP&L Compl. ¶ 1; AHAC Am. Compl. ¶¶ 9–10. Thus, the burden shifts to American Home to show that the underlying actions, reasonably interpreted, plausibly allege a sudden and accidental release of PCBs at the Ward Site.

In its June 2015 order, the court noted that, of the allegations contained within the CP&L and Consol complaints, only one could possibly fall within the Federal policy's identical sudden and accidental discharge exception. See PCS Phosphate Co., Inc., v. Am. Home Assurance Co., No. 5:14-CV-99-D, 2015 WL 3742965, *4–5 (E.D.N.C. June 15, 2015) (unpublished). Specifically, the court identified an allegation in the underlying CP&L complaint that "many of the transformers were leaking when they arrived at the Ward Facility, which also resulted in the release or discharge of oil at the Site. For example, notes on the repair documents for one transformer indicate that 'it faulted and blew oil out of the unit.'" Id. at *4 (quotation omitted); see [D.E. 55] 9; [D.E. 55-1] ¶ 59(106). Examining only the original third-party complaint and the attached and integrated underlying complaints, the court noted that "[u]nlike the gradual oil leakage from shipped or stored transformers, the allegation that a transformer 'faulted and blew oil out' possibly falls within the sudden and accidental discharge exception." PCS Phosphate, 2015 WL 3742965, at *4. Observing that it had no information regarding the timing of the alleged blowout, the court noted that "[t]he allegation in the CP&L complaint possibly occurred during the time when Federal insured PCS and falls outside the pollution exclusion, and is therefore covered." Id. Although the CP&L complaint listed the allegation as an example of a transformer that was leaking upon arrival at the Ward Site, the court liberally construed the allegation as possibly supporting relief. The court dismissed in part the action against Federal, allowing the claim based upon the alleged blowout incident to proceed. Id. at *7. It also allowed American Home the opportunity to amend its third-party complaint. Id.

---

damages from PCS for remediation of . . . [PCB] contamination at and originating from the Ward Site.").

10

American Home amended its third-party complaint. In so doing, however, it showed that the previously-alleged blowout could not possibly be covered by the Zurich 1981–1986 policies. In the amended complaint, American Home alleges that PCBs were "sudden[ly] and accidental[ly] release[d]" at the Ward Site. AHAC Am. Compl. ¶ 11. The amended complaint then notes that this factual allegation "[s]pecifically" refers to the blowout incident alleged in the CP&L complaint. Id. The CP&L complaint, which is again attached to the amended complaint, states that "many of the transformers were leaking when they arrived at the Ward Facility" and lists as an "example" that "notes on the repair documents for one transformer, indicate that it 'faulted and blew oil out of the unit.'" CP&L Compl. ¶ 59(106). Since the "notes" were not attached to the original third-party complaint, they were not considered. Now, American Home has attached Exhibit 3 to its amended complaint, alleging that it contains "business records of the Ward Transformer Company" that "show a sudden and accidental release of PCB-laden oil." AHAC Am. Compl. ¶ 12; [D.E. 66-2]; [D.E. 66-3] 7; see E.I. du Pont de Nemours, 637 F.3d at 448 (The court considers "documents attached or incorporated into the complaint" (emphasis added)). Exhibit 3 contains two copies of what appears to be a transportation record. [D.E. 66-3] 3, 7. The transportation record notes that on November 24, 1987, a transformer was shipped to the Ward Site because it had previously "faulted and blown the oil out of the unit." Id. 7.

Considering the amended complaint and the attached or incorporated documents, the court concludes that the CP&L complaint cannot be reasonably construed to allege a sudden and accidental discharge at the Ward Site. Although American Home alleges that a "sudden and accidental discharge" occurred at the Ward Site, it immediately clarifies that it refers "[s]pecifically" to the blowout alleged in the CP&L complaint. AHAC Am. Compl. ¶ 11. The CP&L complaint cites the transformer described in the repair note as a transformer that "w[as] leaking" upon arrival. CP&L Compl. ¶ 59(106). The transportation record attached to the complaint uses the exact language quoted in the CP&L complaint and demonstrates that the transformer blowout mentioned in the

11

record occurred before the transformer's shipment to the Ward Site and was the reason the transformer was shipped for repair. See [D.E. 66-3] 3, 7. Thus, the blowout described in the transportation record must have occurred offsite. The court's previous, liberal interpretation of the CP&L complaint as "possibly" supporting a claim to relief can no longer be sustained in light of the transportation record attached in Exhibit 3. The transportation record appears from its identical language to be the "notes" referenced in CP&L complaint.[4] In light of this document, it would be unreasonable to interpret the CP&L complaint to allege a blowout at the Ward Site. The underlying actions seek damages for contamination at the Ward Site. Consol Compl. ¶ 1; CP&L Compl. ¶ 1; AHAC Am. Compl. ¶¶ 9–10. A sudden and accidental release of contaminants at another location does not fall within the ambit of the underlying actions and thus cannot possibly give rise to a duty to defend or to indemnify or contribute costs.

American Home cites additional documents within Exhibit 3 to suggest that sudden and accidental releases of PCBs may have occurred. None of these documents, however, render it reasonable to interpret one of the underlying actions as alleging a sudden and accidental release at the Ward facility.[5] In fact, several of the documents reinforce that the CP&L complaint, reasonably interpreted, alleges only that several transformers were leaking before their arrival at the Ward Site.

---

[4] Zurich American also argues that the blowout described in the transportation records cannot support American Home's claim because the blowout occurred outside the policy coverage dates. [D.E. 73] 11–15. The underlying complaint, however, describes the blowout as an "example" of a transformer that was leaking upon arrival at the Ward Site. Construing the complaint in the light most favorable to American Home, the court can reasonably infer that PCS shipped other leaking transformers to the Ward Site within the coverage dates. Regardless of whether similar transformer shipments to the Ward Site occurred during the policy period, continuous leakage of PCBs from transformers that leaked upon arrival cannot qualify as a "sudden and accidental" discharge.

[5] The court looks to these documents only for their value, if any, in interpreting the underlying complaints. Where an underlying complaint contains no allegations that would invoke a duty to defend, American Home cannot use unsworn allegations contained in a different case as extrinsic "evidence" that a sudden and accidental discharge of PCBs took place involving Consol. See PCS Phosphate, 2015 WL 3742965, at *5; cf. Neth. Ins. Co., 95 A.3d at 1049 (noting that a court looks to the complaint in the underlying action to determine whether a duty to defend exists); Misiti, 61 A.3d at 491 (same).

For example, one document states that "very high concentrations of all combustibles & gas generation patterns indicate discharges of high energy . . . Recommendation: shutdown immediately." [D.E. 66-3] 1. While a "discharge[] of high energy" might suggest a sudden and accidental release, the recommendation to shut down the transformer makes clear that these discharges occurred while the transformers were in operation and away from the Ward Site. Another document indicates that a transformer was "leaking badly . . . [and was] In-Route to Ward[]." Id. 2, 6, 9. A third document indicates that a transformer that Ward received from Texas Gulf was "leaking excessively." Id. 5, 10. Finally, one document suggests that a non-PCB transformer showed signs of having discharged oil at some point. Id. 4, 8.

American Home has not met its burden to show that an allegation in either underlying complaint can be reasonably interpreted to allege a sudden release of contaminants or pollutants at the Ward Site. Accordingly, American Home has not met its burden to show a duty to defend under the 1981–1986 policies and this court predicts that the Supreme Court of Connecticut would not find a duty to defend in this case. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co., 433 F.3d 365, 369 (4th Cir. 2005) (holding that a federal court sitting in diversity must predict how the state's highest court would rule if faced with the legal issue). Thus, the court grants Zurich American's motion for partial judgment on the pleadings [D.E. 72] concerning the 1981–1986 policies.

B.

Next, the court examines whether under Canadian law the 2005–2008 policy imposes upon Zurich American a contractual duty to defend PCS.[6] Under Canadian law, as under Connecticut law, the duty to defend is broader than the duty to indemnify. Non-Marine Underwriters, 2000 SCC 24,

---

[6] The policy obliges Zurich American "[t]o pay on behalf of [PCS] all sums which [PCS] shall become legally obligated to pay as damages because of property damage caused by an occurrence" and to "defend in the name and on behalf of [PCS]. . . any civil action . . . , even if said action be groundless, false, or fraudulent." [D.E. 73-7] 3–4.

13

at paras. 75–78; see, e.g., McDermit v. McDermit, 2013 SKPC 25, paras. 31–32 (Can.); see also Precision Plating Ltd. v. Axa Pac. Ins. Co., 2015 BCCA 277, para. 31 (Can.); Dave's K. & K. Sandblasting (1988) Ltd. v. Aviva Ins. Co. of Can., 2007 BCSC 791, para. 9 (Can.).[7] "[T]he duty to defend arises only where the pleadings raise claims which would be payable under the agreement to indemnify in the insurance contract." Nichols v. Am. Home Assurance Co., [1990] 1 S.C.R. 801, 810 (Can.); see Monenco Ltd. v. Commonwealth Ins. Co., 2001 SCC 49, paras. 28–29 (Can.). Conversely, an insurer has no duty to defend if all possible claims fall under exceptions to the insurance contract. Progressive Homes Ltd., 2010 SCC 33, at para. 19; see Non-Marine Underwriters, 2000 SCC 24 at paras. 74–83; cf. Precision Plating Ltd., 2015 BCCA 277, at paras. 43–47 (holding that an insurer had a duty to defend when the potentially insured loss had multiple independent causes, some of which were covered and some of which were excluded).

Canadian courts also apply a burden-shifting analysis. The insured initially must establish "that the insured object was damaged by an insured peril. On the other hand, the insurer has the burden of establishing that the loss is nonetheless excluded, either because of an exclusion or because the insured breached a condition precedent to recovery." Denis Boivin, Essentials of

---

[7] American Home challenges the application of Saskatchewan law in part because Zurich American has failed to explain the hierarchy of the Canadian court system and has therefore not "'adequately prove[n] [the] foreign law so as to enable the court to apply it.'" [D.E. 75] 10 n.11 (quoting Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd., 181 F.3d 435, 440 (3d Cir. 1999)) (alteration in original). The court disagrees. Counsel for both parties have provided this court with Canadian case law in support of their arguments. See [D.E. 73] 19–21; [D.E. 75]10–14. The court has gathered sufficient information to predict how the Supreme Court of Canada would rule in this case. Cf. Twin City Fire Ins. Co., 433 F.3d at 369. In citing cases from various Canadian provinces, Zurich American appears to assume, correctly, that Canadian federalism parallels federalism in the United States. When a higher court has not provided authoritative law on point, Canadian courts look to other Canadian courts for persuasive authority and occasionally cite case law from the United States, particularly in commercial contexts. See Elgar Encyclopedia of Comparative Law 117 (Jan M. Smits ed. 2006); Peter McCormick, American Citations and the McLachlin Court: An Empirical Study, 47 Osgoode Hall L.J. 83, (2009), http://ohlj.ca/english/documents/0347_1_McCormick_PSS_090607.pdf; see also, e.g., Zurich Ins. Co. v. 686234 Ont. Ltd. (2002), 62 O.R. 3d 447, paras. 9–15 (Can. Ont. C.A.). Accordingly, this court treats such sources as persuasive indicia of how the Supreme Court of Canada would interpret the 2005-2008 policy.

14

Canadian Law: Insurance Law 190 (2004); see Cont'l Ins. Co. v. Dalton Cartage Co., [1982] 1 S.C.R. 164, 168–69 (Can.).

To determine whether an insurance exclusion applies, a court must interpret the insurance contract. The court will give the words of the contract their ordinary meaning. Boivin, supra, at 191; Craig Brown, Introduction to Canadian Insurance Law 65–66 (2d ed. 2006); see Consol.-Bathurst Exp. Ltd., [1980] 1 S.C.R. 888, at 892. Courts aim to give effect to the parties' intentions and avoid frustrating the parties' reasonable expectations. Consol.-Bathurst Exp. Ltd., [1980] 1 S.C.R. 888, at 901; Boivin, supra, at 191; Brown, supra, at 64–65, 67–68. In the insurance context, to avoid frustrating the reasonable expectations of those who purchase insurance, courts often interpret policy exclusions narrowly. Zurich Ins. Co. v. 686234 Ontario Ltd. (2002), 62 O.R. 3d 447, paras. 24–25, 27 (Can. Ont. C.A.); see Consol.-Bathurst Exp. Ltd., [1980] 1 S.C.R. 888, at 901–02; Boivin, supra, at 191–92; Brown, supra, at 65; see also Piggott Const. (1969) Ltd. v. Sask. Gov't Ins. Office (1985), 44 Sask. R. 203, paras. 7–8, 30–32 (Can. Sask. C.A.); Boivin, supra, at 200–01 (exclusions can frustrate reasonable expectations developed by oral representations). Courts particularly favor a narrow construction of policy exclusions when a broad construction would render the insurance contract worthless. See Zurich Ins. Co. (2002), 62 O.R. 3d 447, at paras. 24–25, 27.

American Home has met its initial burden of showing that the underlying civil actions seek damages that fall within the broad general liability coverage of the 2005-2008 policy. Compare [D.E. 73-7] 3–4, and [D.E. 75] 4 n.5, with Consol Compl. ¶ 1 (a civil action seeking recovery for property damage), and CP&L Compl. ¶ 1 (same). Thus, the burden shifts to Zurich American to show that the loss is nonetheless excluded. Zurich American argues that it cannot be held liable for PCB contamination at the Ward Site under the 2005–2008 policy because the policy excludes coverage for pollution.

The 2005–2008 policy excludes coverage for "the actual, alleged, or threatened discharge, dispersal, release or escape of pollutants . . . at or from any site or location used by or for the Insured

15

or others for the handling, storage, disposal, processing or treatment of waste material." [D.E. 73-7] 8. It defines "[p]ollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapour, soot, fumes, acids, alkalis, chemicals and waste material" and "[w]aste material" as "materials which are to be recycled, reconditioned or reclaimed." Id. 9. Zurich American contends that the underlying actions against PCS fall into this exclusion and it therefore has no duty to defend or indemnify PCS under the 2005–2008 policy. See [D.E. 73] 18–24. Variations of this exclusion, known as the "absolute pollution exclusion," commonly appear in Canadian commercial general liability policies drafted since 2005. See Craig A.B. Ferris, Pollution Exclusion Clauses: An Analysis of the Canadian Jurisprudence 1–2 (Lawson Lundell LLP 2008), www.lawsonlundell.com/media/news/163_PollutionExclusionClauses. The absolute pollution exclusion here specifies both a particular type of damage and a particular type of location. To be excluded, damage must (1) be due to the "the actual, alleged or threatened discharge, dispersal, release or escape of pollutants" that (2) occurred at a site "used . . . for the handling, storage, disposal, processing or treatment of waste material." [D.E. 73-7] 8.

First, the court must determine whether the "release[]" and/or "threatened release[]" of PCBs alleged in the underlying actions qualify as "the actual, alleged or threatened discharge, dispersal, release or escape of pollutants" under the policy. Giving ordinary meaning to the terms of the policy, the allegations so qualify. Compare Consol Compl. ¶ 197 (alleging releases or threatened releases of PCBs at the Ward Site), and CP&L Compl. ¶ 73 (same), with [D.E. 73-7] 9 (defining "[p]ollutants" to include "any . . . contaminant"); see also AHAC Am. Compl. ¶¶ 9–10 (The EPA action, if considered a separate underlying action, also seeks recovery based upon release of PCBs). Canadian case law supports this plain reading of the contract. Although Canadian courts have disagreed as to the precise limits of the term "pollution," they agree that "traditional environmental contamination" falls within its heartland. Zurich Ins. Co. (2002), 62 O.R. 3d 447, at paras. 9–20, 34–38; see ING Ins. Co. of Can. v. Miracle, 2011 ONCA 321, paras. 23–24 (Can.); Corbould v.

BCAA Ins. Corp., 2010 BCSC 1536, paras. 83, 96 (Can.); Dave's K. & K. Sandblasting (1988) Ltd., 2007 BCSC 791, at paras. 26–27.

Next, American Home correctly argues that the cases cited by Zurich American do not address the second limitation in the exclusion at issue here—the requirement that, to be excluded, the pollution must have occurred at site "used . . . for the handling, storage, disposal, processing or treatment of waste material." Compare [D.E. 73-7] 8, with [D.E. 75] 11–13 nn.12–16. To determine whether the pollution exclusion in the 2005–2008 policy applies, this court must determine whether the Ward Site was "used . . . for the handling, storage, disposal, processing or treatment of waste material," defined as "materials which are to be recycled, reconditioned or reclaimed." See [D.E. 73-7] 8–9.

A plain reading of the CP&L complaint and the Consol complaint show that the Ward Site qualifies as a location "used . . . for the handling, storage, disposal, processing or treatment of waste material." Specifically, as Zurich American notes, the CP&L complaint alleges that the Ward Site "includes a former transformer . . . repair . . . and reconditioning facility," CP&L Compl. ¶ 2, at which copper and/or aluminum wire, oil, and other components of electrical transformers were removed, stored, disposed of, and replaced as a part of the repair and reconditioning process. See id. ¶¶ 4, 6, 11, 21, 24–25. The Consol complaint similarly describes the Ward Site as one where transformers were "repaired, rebuilt and/or reconditioned," Consol Compl. ¶ 153(a), and alleges that, "[i]n the process of changing or replacing [fluids contained within the transformers], PCBs were spilled, leaked or otherwise released into the environment." Id. ¶ 169. Thus, both underlying actions describe transformers or their parts and contents as "materials which are to be recycled, reconditioned or reclaimed." See [D.E. 73-7] 9. Accordingly, transformers themselves or the oil, wire, or other parts qualify as "waste materials." Accord Gary Steacy Dismantling Ltd., 1997 CarswellOnt 5010, para. 2 (Can. Ont. Envtl. Assessment Bd. Decision) (WL) ("The wastes that would be received for processing or transfer are transformer fluids, waste electrical transformers,

porous electrical transformer components, fluorescent light ballasts, inorganic sludges, and emulsified oils. All of these would be subject to explicit limitations in terms of waste classes, quantities, PCB levels, or weights."); Rubin v. Dir., Ministry of the Env't, 2012 CarswellOnt 16744, para. 3 (Can. Ont. Envtl. Rev. Trib.) (WL) (referring to "oil, ballasts and capacitors" as "waste materials"); Can. (Att'y Gen.) v. Kinetic Contaminants Can. Ltd., 1990 CarswellOnt 432, para. 2 (Can. Ont. Sup. Ct.) (WL). But cf. Harvey's Oil Ltd. v. Lombard Gen. Ins. Co. of Can., 2003 NLSCTD 158, paras. 11, 54 (holding that fuel oil was not a "pollutant," the definition of which included "waste" until it escaped from containment) (Can.). Additionally, each underlying action alleges that "handling, storage, disposal, processing, or treatment" of the transformers, the oil therein, and the wire and other parts occurred at the Ward Site. See, e.g., CP&L Compl. ¶¶ 4, 6, 11, 21; Consol Compl. ¶¶ 153, 169. Hence, the Ward Site was a location "used . . . for the handling, storage, disposal, processing or treatment of waste material," and the pollution exclusion in the 2005–2008 policy applies.

Zurich American has met its burden concerning the 2005–2008 policy. Thus, Zurich American owes no duty to defend the underlying actions. See, e.g., Progressive Homes Ltd., 2010 SCC 33, at para. 19.

### III.

In American Home's second claim, it seeks an order that Federal must indemnify American Home for "costs incurred for the defense of and indemnity for PCS." AHAC Am. Compl. ¶¶ 41–42. As discussed, Zurich American does not owe a duty to defend or indemnify PCS. Accordingly, Zurich American owes no duty to indemnify American Home for the costs that American Home incurs defending or indemnifying PCS. Thus, the court grants Zurich American's motion for partial judgment on the pleadings concerning both the Consol and CP&L actions.

IV.

Alternatively, American Home seeks an order that Zurich American owes contribution of defense and indemnity costs to American Home for costs incurred in the underlying actions. See AHAC Am. Compl. ¶¶ 44, 46. "The right of action for contribution . . . arises when, as between multiple parties <u>jointly</u> <u>bound</u> to pay a sum of money, one party is compelled to pay the entire sum." Sec. Ins. Co. of Hartford v. Lumbermens Mut. Cas. Co., 826 A.2d 107, 123 (Conn. 2003) (emphasis in original) (quotation omitted); accord Family Ins. Corp. v. Lombard Can. Ltd., 2002 SCC 48, para. 14 (Can.) ("[W]here an insured holds more than one policy of insurance that covers the same risk, the insured may never recover more than the amount of the full loss but is entitled to select the policy under which to claim indemnity, subject to any conditions to the contrary. The selected insurer, in turn, is entitled to contribution from all other insurers who have covered the same risk."). American Home has not plausibly alleged that either the 1981–1986 policies or the 2005–2008 policy oblige Zurich American to contribute to PCS's defense or indemnification in either of the underlying actions. Thus, the court grants Zurich American's motion for partial judgment on the pleadings concerning both the Consol and CP&L actions.

V.

In sum, the court GRANTS Zurich American's motion for partial judgment on the pleadings [D.E. 72]. The court DISMISSES American Home's claims against Zurich American with respect to the underlying Consol and CP&L actions.

SO ORDERED. This **29** day of March 2016.

JAMES C. DEVER III
Chief United States District Judge

19